William Frank PARKER *v.* STATE of Arkansas

CR 86-91 731 S.W.2d 756

Supreme Court of Arkansas
Opinion delivered June 15, 1987

*W.H. Taylor* and *James G. Lingle*, for appellant.

*Steve Clark*, Att'y Gen., by: *Jack Gillean*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. William Frank Parker was convicted of two counts of capital felony murder for which he was sentenced to death; two counts of attempted first degree murder (thirty years imprisonment and $15,000 fine for each); two counts of burglary (twenty years imprisonment and $15,000 fine for each); kidnapping (life imprisonment and $15,000); and attempted capital murder (thirty years imprisonment and $15,000). Parker's capital felony murder convictions were for causing the deaths of James and Sandra Warren in the course of and in furtherance of a burglary. The burglary, as proved by the state, was the entry of the Warrens' home for the purpose of committing therein the murders of the Warrens. The capital felony murder convictions must be reversed because the Warrens' deaths were not caused "in the course of and in furtherance of" a burglary as required by Ark. Stat. Ann. § 41-1501(1)(a) (Repl. 1977), and because the trial court erred in submitting evidence under Ark. Stat. Ann. § 41-1303(3) (Repl. 1977) regarding previously committed felonies as an aggravating circumstance at the penalty phase of the appellant's trial. Parker's remaining arguments contain no reversible error, thus we affirm each of his other convictions.

The relevant facts are basically undisputed as Parker's primary defenses at trial related to his mental capacity at the time of the events. Parker was divorced from Pam Warren. Pam's father, James Warren, and her sister, Cindy Warren, were getting into Mr. Warren's truck in front of their house on November 5, 1984, when they saw Parker approaching the truck with a gun. Cindy got on the floor of the truck, from where she heard shots being fired. Cindy then got out of the truck and attempted to spray mace into Parker's face. Parker fired one or two shots at Cindy, not hitting her, and then chased Mr. Warren into the house. Mr. Warren and his wife Sandra were later found in the house where they had been shot to death by Parker. In the events that followed that same day, Parker kidnapped and shot his ex-wife, Pam Warren, and shot a police officer three times in a shootout at the Rogers Police Department.

## 1. CAPITAL FELONY MURDER

Parker maintains the trial court erred in not directing a verdict in his favor on the capital murder charges for killing the Warrens. Parker was charged under Ark. Stat. Ann. § 41-1501(1)(a), which provides:

> A person commits capital murder if: . . .he attempts to commit rape, kidnapping, arson, vehicular piracy, robbery, burglary, or escape in the first degree, and *in the course of and in furtherance of the felony*, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life; . . . (emphasis added)

An analysis of this statute leads us to the conclusion that it cannot be read to encompass the facts of this case. The state's proof showed that Parker followed Mr. Warren into the house for only one purpose—to commit the murders of the Warrens. The entry was a burglary because Parker unlawfully entered an occupiable structure with the intent to commit those punishable offenses. Ark. Stat. Ann. § 41-2002 (Repl. 1977). The killings were obviously a form of criminal homicide of some degree, but they were not "in the course of and in furtherance of" the burglary as required to be capital felony murder. Parker could have been charged under subsection (1)(c) of § 41-1501 for

causing the death of two or more persons in the course of the same criminal episode. Instead, the prosecutor elected to proceed under subsection (1)(a), which was wrong. We must reverse.

■ Relying on *Blango v. United States*, 373 A.2d 885 (D.C. 1977), the state argues that the societal interests served by the burglary statute justify its use to support capital felony murder. In that case, *Blango* committed burglary by entering an "occupied dwelling" with the intent to commit assault on the victim. The court reasoned that the burglary violated the "societal interest in protecting occupied dwellings due not only to the inherent danger to occupants during the commission of such an offense, but also to the value society places on the home." The D.C. court stated that the crime was complete upon entry, "and is a separate and distinct act from the succeeding killing, yet may be deemed to be a continuing offense for purposes of the felony murder statute." *Blango* reasoned that the felony murder statute has the distinct societal interest of protecting the security of the person and the value of human life by punishing nonpurposeful killings by implying premeditation and deliberation from the commission of the burglary. *Blango* quoted *People v. Miller*, 32 N.Y.2d 157, 297 N.E.2d 85, 344 N.Y. S.2d 342 (1973) in support of its rationale:

> It should be apparent that the Legislature, in including burglary as one of the enumerated felonies as a basis for felony murder, recognized that persons within domiciles are in greater peril from those entering the domicile with criminal intent, than persons on the street who are being subjected to the same criminal intent. Thus, the burglary statutes prescribe greater punishment for a criminal act committed within the domicile than for the same act committed on the street. Where, as here, the the criminal act underlying the burglary is an assault with a dangerous weapon, the likelihood that the assault will culminate in a homicide is significantly increased by the situs of the assault.

Unlike the case before us, in *Miller* the defendant was convicted of murdering a person who came to the aid of the first victim, whose home the defendant had entered to commit the assault. *Blango* and *Miller's* distinction between whether a murder is

committed in an occupied dwelling as opposed to outdoors may or may not be a valid reason for making it unnecessary to prove the intent ordinarily required for a capital or first degree murder conviction under the applicable statutes in those cases. However, when viewing the language of our own statutes such a distinction does not exist. For the phrase "in the course of and in furtherance of the felony" to have any meaning, the burglary must have an independent objective which the murder facilitates. In this instance, the burglary and murder have the same objective. That objective, the intent to kill, is what makes the underlying act of entry into the home a burglary. The burglary was actually no more than one step toward the commission of the murder and was not to facilitate the murder.

 Simply put, the state has not advanced any convincing argument as to how the murder committed after the burglary could be in the course of and in furtherance of the burglary, both of which are elements required by our statutes. "If we can, we give legislation a construction to affect legislative intent. . .However, this is a criminal statute which must be strictly construed with doubt being resolved in favor of the accused." *Knapp* v. *State*, 283 Ark. 346, 676 S.W.2d 729 (1984). In strictly construing our statutes, as we must do, it is apparent that in order to constitute capital felony murder, the murder must be in the *course of*, and in *furtherance* of the burglary, which is not the case before us.

## 2. PREVIOUSLY COMMITTED FELONIES

Appellant argues that the trial court erred in submitting an instruction on previously committed felonies under § 41-1303(3) as an aggravating circumstance at the penalty phase of his trial. His argument is that there was no evidence that Parker "previously" committed another felony, other than shooting at Cindy Warren, which was contemporaneous with the killings of James and Sandra Warren. We must agree.

Section 41-1303(3) provides as follows:

Aggravating Circumstances—Aggravating circumstances shall be limited to the following:

. . .

(3) the person previously committed another felony, an

element of which was the use or threat of violence to another person or created a substantial risk of death or serious physical injury to another person.

In *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986), this court addressed the question of what is meant by a previously committed offense under this statute. In *Hill* we explained that the reason for section (3) is to allow the state to show that the defendant has a character for violent crimes or a history of committing such crimes. Since there are other avenues by which the state can prove crimes immediately connected with the principal crime, our conclusion was that this section applies to crimes not connected in time or place to the killing for which the defendant has just been convicted. In this instance, the shooting at Cindy Warren was so closely connected in both time and place that it did not present a portrait of the defendant as having previously demonstrated a character for violent crimes or a history for committing such crimes.

Because the trial court erred in submitting this case under our felony murder statute, and in instructing the jury on previously committed felonies, we reverse.

We find no merit in the issues raised by Parker for reversal of the other convictions. In addition to those issues, we will address the questions which may arise on retrial of the capital murder charges.

### 3. CONTINUANCE FOR RECOMMITMENT TO STATE HOSPITAL

Parker argues that the trial court should have granted his motion for a continuance so that he could be reevaluated by the state hospital in support of his insanity defense. The trial court granted Parker's first request for a thirty-day commitment to the state hospital for a mental examination on November 15, 1984. The report from the state hospital, dated January 31, 1985, concluded that Parker was capable of assisting in his defense and that at the time of the commission of the offenses he was able to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.

On July 19, 1985, Parker filed a motion to be recommitted to the state hospital for an additional evaluation. An amended

motion was filed on August 1, 1985, with a letter from Dr. David Pritchard, the forensic psychologist for the Arkansas Department of Human Services who conducted Parker's first examination. Dr. Pritchard said in the letter that he felt it was "professionally advisable to return the defendant to the Arkansas State Hospital for additional neurological and neuropsychological evaluations." The reason for the suggestion was that Dr. Pritchard had been made aware of a statement by Parker found in the Veterans' Administration Hospital records from 1982 in which he gave a history of severe head trauma. Dr. Pritchard stated in the letter that Parker should be returned to the hospital only after the hospital had received the army records which document the head trauma. Parker's counsel had been unable to obtain the records from the St. Louis Army Records Section.

On September 20, 1985, Parker filed a motion for a continuance stating that the medical records pertaining to his head injury could not be obtained, that additional efforts to obtain the records were being made, and that the continuance was necessary to permit him to obtain the records. The trial court denied the motion and the trial began on October 28, 1985.

Parker contends that he was unable to adequately and completely present defenses and mitigating factors based on his mental condition without the neuropsychological evaluation to determine the effect of the head injury. He argues that a defendant should not be forced to go to trial in such a serious case as this without the opportunity to present evaluations from medical personnel who have the benefit of his complete medical history, including prior injuries. Parker states that his statement concerning the prior injury is given credibility because it was found in hospital records from more than two years before the murder. It was corroborated by testimony of Pam Warren, who testified at trial that Parker had told her how he received an injury when he was hit on the head with a pipe while working as a disc jockey at an army base.

Arkansas R. Crim. P. 27.3 states:

The court shall grant a continuance only upon the showing of good cause and only for so long as is necessary, taking into account not only the request or consent of the prosecuting attorney or defense counsel, but also the public

interest in prompt disposition of the case.

Parker was tried just one week short of a year from the date of the crimes.

Whether to grant a continuance is addressed to the sound discretion of the trial court and this court does not reverse unless that discretion has been abused. *Pruett* v. *State*, 282 Ark. 304, 669 S.W.2d 186 (1984). The burden is on the appellant to show that there has been an abuse of the court's discretion in denying the continuance. *Cotton* v. *State*, 265 Ark. 375, 578 S.W.2d 235 (1979). There is no error in the denial of a motion for a continuance to obtain evidence that is not material and not relevant. *Worley* v. *State*, 259 Ark. 433, 533 S.W.2d 502 (1976). In *Worley*, we said the trial court was justified in denying a continuance requested by the appellant in order to secure documentary evidence, where he only verbally assured the court the documents would be forthcoming and it appeared the records might not be material or relevant.

The only evidence of Parker's head trauma was his own statements concerning the injury that were contained in the Veterans' Administration Hospital records and his statements to Pam Warren. Warren also testified that Parker never claimed to have any lasting effects from the injury. Parker's attorneys were never able to produce any documentation of his injury, even though they knew about it as early as July, 1985, when the additional evaluation was requested. The record does not establish whether any documentation could have ever been obtained, and Dr. Pritchard's letter stated that the reevaluation should occur only after the records were received. There is also no evidence of any mental problems suffered as a result of the head injury. For these reasons, the trial court did not abuse its discretion in denying the motion for a continuance.

## 4. DISCOVERY

Parker's next two arguments for reversal are that the trial court erred by not compelling discovery of statements taken by the prosecutor pursuant to his subpoena power, and that the trial court erred in not granting his motion to compel the circuit clerk to issue discovery subpoenas so that he would have the same subpoena power as the prosecutor. We rejected these same

arguments in *Alford* v. *State*, 291 Ark. 243, 724 S.W.2d 151 (1987).

In regard to the first of these issues, Parker contends, as did Alford, that Ark. R. Crim. P. 17.1(b)(i), which requires the prosecutor to disclose to the defendant the "substance of any relevant grand jury testimony," should be extended to compel the prosecutor to furnish statements acquired by subpoena. Parker bases this contention on *Taylor* v. *State*, 220 Ark. 953, 251 S.W.2d 588 (1952), which said that prosecuting attorneys have in a sense replaced grand juries and are subject to the same rules. In *Alford*, we said that the prosecuting attorney did not have to furnish the defendant with statements taken pursuant to a subpoena, but only must disclose to defense counsel any material information within the prosecutor's knowledge, possession or control, which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce any resulting punishment. Ark. R. Crim. P. 17.1(d). The statement sought by Parker was made by Parker's expert witness, Dr. Phillip Barling. Dr. Barling was called to testify by Parker, rather than by the state, and Parker has not shown how any information acquired by the state prejudiced his defense. Thus, there was no error.

We also held in *Alford* that the appellant was not denied due process when he was not allowed equal discovery rights to those given the state in Ark. Stat. Ann. § 43-801 (Repl. 1977). That statute authorizes prosecutors to issue subpoenas and administer oaths in all criminal matters they are investigating. Like Alford, Parker contends the trial court's denial of his motion to subpoena witnesses is violative of the United States Supreme Court's statement on the issue of equal discovery rights in *Wardius* v. *Oregon*, 412 U.S. 470 (1973). In *Alford*, we said:

> The *Wardius* decision does not suggest that the due process clause requires states to adopt discovery procedures in criminal case, but rather it held that, where a state imposes discovery against a defendant, equivalent rights must be given to a defendant. *Hoggard* v. *State*, 277 Ark. 117, 640 S.W.2d 102 (1982). The record before us fails to reflect that the State, by use of its statutory authority to subpoena witnesses, in any way abused that power in an effort to obtain witnesses against the appellant or to secrete

their testimony from him before trial. Thus, we see no merit in appellant's argument.

As in *Alford*, the only witness subpoenaed by the state was called by the defense to testify, rather than by the prosecution, and there is no indication of abuse by the prosecutor of the subpoena power or that any testimony was hidden from Parker. Accordingly, there was no prejudicial error.

Parker next argues that the trial court should have either granted his motion for a continuance or suppressed certain testimony because the state failed to timely disclose certain witnesses' statements to the defense. Parker argues that in response to pretrial motions for discovery, the prosecutor had assured him and the court that he was disclosing all of Parker's previous statements the state had in compliance with Ark. R. Crim. P. 17.1(a)(ii). October 17, 1985, however, eleven days before trial, the state provided Parker with certain statements by witnesses relating what Parker had told them. Seven days before trial, the prosecutor gave the defense affidavits containing more statements Parker had allegedly made to third parties. Parker moved that all the statements be suppressed because they were provided too late for Parker to adequately defend against them or to have them analyzed by his expert witness. Only the testimony of Leta Lloyd, however, is urged as prejudicial by Parker. That testimony concerned statements by Parker about his marital difficulties that show how upset he was over his separation from Pam Warren. Parker argues he could have used these statements to support his contention that his divorce had affected his emotional state before the crimes were committed.

The state argues that Parker's attorneys were able to interview Lloyd before the trial, the statements were provided before trial to the defense's expert witness who said it did not affect his opinion, and the same testimony Lloyd provided about Parker being distraught over the failure of his marriage was provided by other witnesses. The state's position is correct. Accordingly, the trial court did not abuse its discretion in denying the continuance and refusing to suppress the testimony, and Parker has shown no prejudice as a result of the ruling. *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984).

## 5. SEVERANCE

Parker also contends that the trial court should have granted his motion for a severance of the capital murder charges from the other offenses. Two or more offenses may be joined when they (a) are of the same or similar character or (b) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan. Ark. R. Crim. P. 21.1. If offenses are joined solely on the ground that they are of the same or similar character and are not part of a single scheme or plan, a defendant has the right to a severance. Ark. R. Crim. P. 22.2(a). The court shall also grant a severance if it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense. Ark. R. Crim. P. 22.3(b)(i).

It is clear that the crimes charged constituted a single criminal episode and "when a series of acts are connected that is enough to give the state a right to join them in a single information." *Ruiz* v. *State*, 273 Ark. 94, 617 S.W.2d 6 (1981). Parker maintains that the cumulative effect of the offenses was prejudicial and that the severance should have been granted in order to promote a fair determination of his guilt or innocence. Parker has offered no convincing argument that the trial court abused its discretion in determining that a severance was not appropriate to promote a fair determination of Parker's guilt or innocence, and we find no error.

## 6. FUNDS FOR PRIVATE PSYCHIATRIC EXAMINATION

Parker next contends that the trial court should have granted his motion for funds for a private psychiatrist. In *Dunn* v. *State*, 291 Ark. 131, 722 S.W.2d 595 (1987), we held that the defendant's right to an examination under *Ake* v. *Oklahoma*, 470 U.S. 68 (1985) was adequately protected by the examination at the state hospital, an institution which has no part in the prosecution of criminals. In addition, Parker was able to afford the services of Dr. Barling, a clinical psychologist.

## 7. INFLAMMATORY PHOTOGRAPHS

Parker argues also that the trial court erred in admitting several photographs showing the Warrens' bodies at the scene and at the coroner's. Pictures of the blood-stained floor and a picture of the Warrens together while alive were also shown to the jury over Parker's objections.

Parker maintains that the probative value of these photographs was substantially outweighed by the danger of unfair prejudice because of their inflammatory nature and that the photographs were needlessly cumulative. A.R.E. Rule 403. The fact that photographs are inflammatory is not alone sufficient reason to exclude them. *Smith* v. *State*, 282 Ark. 535, 669 S.W.2d 201 (1984). Inflammatory pictures are "admissible in the discretion of the trial judge, if they tend to shed light on any issue or are useful to enable a witness to better describe the objects portrayed or the jury to better understand the testimony, or to corroborate testimony." *Perry* v. *State*, 255 Ark. 378, 500 S.W.2d 387 (1973). We have often held that a photograph is not inadmissible merely because it is cumulative, and that the defendant cannot admit the facts portrayed and thereby prevent the state from putting on its proof. *Rodgers* v. *State*, 261 Ark. 293, 547 S.W.2d 419 (1977). Even the most gruesome photographs have been held admissible when they related to proof of an element of the offense charged. *Perry, supra; Robinson* v. *State*, 269 Ark. 90, 598 S.W.2d 421 (1980); *Gruzen* v. *State*, 267 Ark. 380, 591 S.W.2d 342 (1979).

In *Berry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986), we reversed the trial court when it needlessly allowed seven photographs of the victim's face and dislodged teeth, some of which showed the victim in a more inflammatory state because of the coroner's work on the victim. In *Berry*, the photographs had little relevance to the issues at the trial; depicted injuries inflicted by the appellant's accomplice; were needlessly repetitive; and were unusually inflammatory.

The state argues that the photographs in this case were necessary to show the repeated and accurate shooting of the victims by Parker from close range and while the victims were defenseless. Parker's "extreme indifference to the value of human life" was an element of the capital murder charges. None of the

photographs were unnecessarily gruesome, and the autopsy pictures merely showed the corpses with the blood cleaned away from the bullet wounds. Any prejudicial nature the photographs had did not so substantially outweigh the probative value as would mandate a reversal. We trust, however, that the trial court on retrial will carefully weigh the probative value of each photograph against its prejudicial nature, and not automatically accept every photograph the state has to offer, as we directed in *Berry*.

The photograph of the victims while alive had little, if any, prejudicial effect, but Parker is correct in asserting that it also had no probative value, and it should not be admitted on retrial. *See Parker* v. *State*, 290 Ark. 158, 717 S.W.2d 800 (1986).

## 8. PREVIOUS STATEMENTS OF WITNESS

Parker maintains that the trial court erred in not requiring the prosecutor to provide him with previous statements made by a police officer who testified for the state. Ark. Stat. Ann. § 43-2011.3 (Repl. 1977). We are unable to determine what Parker is alleging as error, because after the request for the statements was made, the trial court agreed that Parker was entitled to whatever the officer had used to refresh his memory, and to any other statements he had previously given or signed, but that he thought Parker already had those statements. Parker's counsel responded that he did. There is nothing in Parker's argument indicating what statements the officer had previously made to which Parker was not given access. Therefore, he has not shown any prejudicial error.

## 9. PROSECUTOR'S ARGUMENT

Parker also contends that the trial court erred in allowing the prosecutor to address the jury in response to a juror's question. After Parker's attorney requested a recess to review a witness's previous statements provided by the prosecutor after the witness had testified, the juror asked why the statements were not provided earlier in order to save time. The prosecutor was allowed to tell the jury that the statements had been supplied to the defense on April 3, 1985, that the witness had testified in a pretrial hearing, that a transcript of the hearing was available to

the defense, and that other notes had been made available while the witness was testifying.

Parker argues that this, in effect, made the prosecutor an unsworn witness, who was not subject to cross-examination. The prosecutor, however, did not address the jury on an issue pertaining to Parker's guilt or innocence, but only sought to correct the impression that the state had not given the defense adequate time to review the statements the prosecution had in its possession. The trial court was wrong in permitting the prosecutor to address the jury, however, Parker has not shown any prejudice as a result of the prosecutor's response to the juror's question, and we need not reverse. *Berna, supra.*

## 10. DISCRETION IN SENTENCING

Parker alleges that the trial court failed to exercise its discretion in imposing the sentences recommended by the jury. The responsibility for sentencing was placed with the jury by Ark. Stat. Ann. § 41-802 (Repl. 1977). Parker has apparently confused this situation with the rule that the judge must exercise discretion in determining whether sentences should run consecutively or concurrently. Ark. Stat. Ann. § 41-903 (Repl. 1977); *Wing* v. *State*, 286 Ark. 494, 696 S.W.2d 311 (1985). No error was committed.

## 11. CONSTITUTIONALITY OF CAPITAL FELONY MURDER STATUTE

Finally, Parker argues that our capital murder statute is unconstitutional in its application, because it has been applied almost exclusively to males. This argument was not raised at trial, and thus we are not required to address it on appeal. *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986). For purposes of the retrial, however, we note that we see no merit in the argument that our facially neutral statute, held constitutional in *Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1977), was passed with any discriminatory intent towards men.

## 12. SEVERANCE OF JUDGMENT

In *Martin* v. *State*, 290 Ark. 293, 718 S.W.2d 983 (1986), we held that "[w]hen a judgment in a criminal case is correct as to one count, but erroneous as to another, as in this case,

we have the power to sever the judgment, affirm the count on which the appellant was properly convicted, and reverse and grant a new trial as to the other." Accordingly, the capital murder convictions are reversed. Parker's other convictions are affirmed.

HICKMAN, J., concurs.

HAYS and GLAZE, JJ., dissent.

DARRELL HICKMAN, Justice, concurring. I concur and write merely to maintain my opposition to the decision in *Berry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986).

TOM GLAZE, Justice, dissenting. I respectfully but vigorously disagree with the majority decision concerning its disposition and reversal of the capital felony murder conviction regarding appellant's killing of Sandra Warren. Although it can be said that the appellant entered the Warren's house to kill James Warren, the proof at the same time precludes that he entered the house with the intention to murder Sandra. Cindy Warren testified that the appellant saw her and her father, James, when they were departing James' truck in front of the Warren house. Appellant shot at Cindy and then his "attention automatically went to my father," as her father was running to the house.

I fail to see any logic in the majority's attempt to distinguish the instant case from either the holding in *People* v. *Miller*, 32 N.Y.2d 157, 297 N.E.2d 85, 344 N.Y.S.2d 342 (1973), or *Blango* v. *United States*, 373 A.2d 885 (D.C. 1977). As was true with the defendants in those cases, the appellant here entered an occupiable structure to commit a crime other than the one with which he was convicted. In this respect, appellant entered the Warren house with the ostensible purpose of killing James Warren—which the majority concedes was a burglary because appellant entered an occupiable structure with the intent to commit an offense punishable by imprisonment. Ark. Stat. Ann. § 41-2002 (Repl. 1977). Again, as were the situations in *Miller* and *Blango*, appellant, while in the course and furtherance of committing this burglary (felony), murdered James' wife, Sandra—a second and distinct crime.

The rationale underlying the *Miller* and *Blango* decisions is that the legislature, in including burglary as one of the enumerated felonies as a basis for felony murder, recognized that persons

within domiciles are in greater peril from those entering the domicile with criminal intent than persons on the street who are being subjected to the same criminal intent. Thus, the burglary statutes prescribe greater punishment for a criminal act committed within the domicile than for the same act committed on the street.

In the instant case, appellant's entry into the secluded and confined homestead of the Warrens in his pursuit and effort to kill James also enhanced greatly the prospects that he would kill anyone else trapped within those confines. I believe the rationale underlying our State's felony murder statute is sound, and the facts of this case implore its application, at least as to Sandra Warren.

I also disagree with our court's holding in *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986), insofar as that decision interpreted Ark. Stat. Ann. § 41-1303(3) (Repl. 1977). In my view, this court placed a much too restrictive interpretation on the words "previously committed" when deciding what prior violent crimes can be used in establishing aggravating circumstances for sentencing purposes in capital felony murder cases.

In *Hill*, we explained that the reason for section (3) is to allow the state to show that the defendant has a character for violent crimes *or a history of committing such crimes*. This court then parlayed that reasoning to arrive at the conclusion that section (3) applies to crimes not connected in time or place to the killing for which the defendant has just been convicted. Such reasoning and logic engrafts a restriction on the employment of section (3) that simply is not there.

Here, I have no problem reaching the conclusion that appellant's acts warranted the jury's consideration of the plain language used in section (3)—that he previously committed another felony, an element of which was the use or threat of violence to another person or created a substantial risk of death or serious physical injury to another person. Undisputably, appellant attempted to murder Cindy Warren outside the Warren house just moments before he entered the home where he killed both James and Sandra Warren. The majority holdings here and in *Hill* raise more questions than they answer. For example, if appellant had attempted to shoot Cindy an hour ear-

lier—somewhere on the grounds but outside the house—could section (3) be employed? What would be the result if appellant's prior acts had happened the day before he entered the Warren house to kill James? In short, at what point in time and place may a defendant's prior violent acts be used to justify the usage of section (3)?

We become entrapped in our own web, so-to-speak, when we add language to section (3) that is not there. The purpose, I submit, of section (3), is merely to permit a jury to consider a defendant's violent nature, as he had previously applied it towards others, regardless of when and where such violence occurred.

For the reasons stated, I would affirm William Parker's conviction and find no error in giving the instruction on previously committed felonies.

HAYS, J., joins in this dissent.